81 F.3d 1508
 70 Fair Empl.Prac.Cas. (BNA) 1052
 EQUAL EMPLOYMENT OPPORTUNITY COMMISSION and Ellie Jordan,
Plaintiffs-Appellants/Cross-Appellees,
v.
WILTEL, INC., formerly known as Williams Telecommunications
Group, Inc. Defendant-Appellee/Cross-Appellant.
 Nos. 94-5131, 94-5132 and 95-5065.
 United States Court of Appeals,
Tenth Circuit.
 April 18, 1996.
 
 Appeal from the United States District Court for the Northern District of Oklahoma (D.C. No. 92-C-142-E).
 Dori K. Bernstein, Attorney (C. Gregory Stewart, General Counsel, Gwendolyn Young Reams, Associate General Counsel, Carolyn L. Wheeler, Assistant General Counsel, with her on the brief), Washington, DC, for Plaintiff-Appellant.
 J. Patrick Cremin (Michelle T. Gehres with him on the brief), of Hall, Estill, Hardwick, Gable, Golden & Nelson, Tulsa, Oklahoma, for Defendant-Appellee.
 John M. Young, Attorney, on behalf of Ellie Jordan, Plaintiff-Appellant adopted the brief of Equal Employment Opportunity Commission.
 Before PORFILIO, McWILLIAMS, and ALARCON,* Circuit Judges.
 ALARCON, Senior Circuit Judge.
 
 
 1
 The Equal Employment Opportunity Commission ("EEOC"), and Ellie Jordan as plaintiff-intervenor, appeal from the final judgment entered in favor of WilTel, Inc., ("WilTel") in this Title VII action. The district court found that WilTel refused to hire Jordan for a permanent position as a carrier customer service representative because she is an evangelical Christian. Nevertheless, the district court denied any relief to Jordan because she submitted a forged reference letter from a prior employer in support of her job application. The fact that the letter was fraudulent was not discovered until after the alleged discriminatory conduct and the filing of this action.
 
 
 2
 The EEOC and Jordan argue that the district court erred in concluding that Jordan was not entitled to money damages, and that the EEOC was not entitled to injunctive relief, as a remedy for WilTel's discriminatory rejection of Jordan's application for employment as a carrier customer service representative. In its cross-appeal, WilTel seeks reversal of the district court's finding that Jordan's employment application was rejected because she is an evangelical Christian and requests that we affirm the district court's judgment.
 
 
 3
 We affirm because we conclude that the district court clearly erred in finding that Jordan was qualified for the position but was rejected solely because she is an evangelical Christian. Accordingly, we do not consider the merits of the question whether an applicant for employment who is rejected solely on discriminatory grounds is entitled to any relief if the employer subsequently discovers a legitimate business reason to support the hiring decision.
 
 
 4
 * PERTINENT FACTS
 
 
 5
 Jordan is a member of the Southern Baptist denomination. She describes herself as an "evangelical Christian." WilTel is a telecommunications services company. In 1988, WilTel owned a fiber optic network. It offered network services to inter-exchange carriers, and to commercial end-users for the transmission of business communications and information.
 
 
 6
 In October, 1987, at WilTel's request, Jordan was assigned to work at WilTel as a temporary clerical employee by Hannah's Temporary Agency. Jordan was placed in the Customer Service Department as a temporary secretary. Clarissa Esquivel was her immediate superior.
 
 
 7
 Shortly after Jordan began her temporary employment, Esquivel attempted to find a permanent position for her at WilTel. Esquivel asked Gordon Martin and Julie Hackett, her manager, to hire Jordan for the position of department secretary of the Customer Service Department. Jordan was not hired as department secretary because that job position had not been approved at the time of Esquivel's request.
 
 
 8
 In March, 1988, five job openings in Tulsa, Oklahoma became available for the position of carrier customer service representative. The announcement for the position provided that applicants were required to have two to four years experience in customer service/telephony,[1] plus organizational, communications, and interpersonal skills.
 
 
 9
 In 1988, WilTel had a written policy that gave preference to applicants who were internal employees. Temporary employees such as Jordan were not considered to be internal applicants.
 
 
 10
 Jordan applied for the position of carrier customer service representative. In support of her application, Jordan submitted a resume and letters of reference from prior employers. One letter of recommendation was purportedly from Nurit O. Glick, Director of Education at the B'Nai Emunah Religious School where Jordan had worked as a secretary for three months. The letter was highly complimentary. It disclosed a close personal attachment between Glick and Jordan.[2] At her deposition on May 20, 1993, Glick testified that, when Jordan left the B'Nai Emunah Religious School, they were not on speaking terms. Glick testified further that Jordan did not ask Glick to write a reference letter. Glick stated that she never wrote, dictated, or authorized a third party to write a reference letter on Jordan's behalf. When shown the reference letter, Glick denied writing it.
 
 
 11
 Three WilTel employees, Gordon Martin, Supervisor of Compensation and Benefits and the Tulsa Supervisor of Human Resources, Julie Hackett, Manager of Customer Services, and Clarissa Esquivel, Supervisor of Customer Services interviewed the applicants and recommended five for employment. The record shows that Karen Miller and Roni Baker, who were customer service representatives, also interviewed Jordan for the position. Esquivel testified in her deposition taken on February 4, 1994, that neither Miller nor Baker recommended hiring Jordan.[3] Miller testified at trial that she told Esquivel that Jordan was not qualified for the position.
 
 
 12
 The record shows that Esquivel requested that Martin permit Jordan to be considered for the position of carrier customer service representative without going through the resume screening process ordinarily conducted by WilTel's Human Resources department. Martin informed Esquivel that he had not intended to include Jordan in the list of qualified applicants because her skills were primarily secretarial and clerical. Martin testified that Jordan was granted an interview solely because of Esquivel's request.
 
 
 13
 Nancy Smith, the Director of Customer Services, testified that "[f]airly early on and soon after Claire became a supervisor Claire was pretty consistent in her lobbying efforts to bring Ellie Jordan on board full time." Smith stated that she had "[p]retty low" confidence in Esquivel's ability to make a hiring decision and "[t]he fact that she consistently lobbied for Ellie over a course of several months was of concern." Despite these concerns, both Hackett and Smith agreed to allow Jordan to interview for the position "[b]ased on the fact that Julie wanted to work well with Claire."
 
 
 14
 Esquivel gave Jordan special training in the duties of a carrier customer service representative after the work day was completed. In addition, Esquivel assigned Jordan to fill in for absent carrier customer service representatives. Esquivel testified that Jordan "was fully qualified to take on a [carrier customer service representative] position with little or no additional training." Esquivel did not schedule a formal interview with Jordan.
 
 
 15
 After reviewing Jordan's resume, and interviewing her, Martin concluded that she lacked the qualifications and experience necessary for the position of carrier customer service representative. Martin decided that she was not qualified, notwithstanding her work in the Customer Services Department because her experience was limited to typing customer correspondence and contracts.
 
 
 16
 Hackett testified that she concluded that Jordan was unqualified for the position because she had no specific customer service, telecommunication experience, or the skills necessary to perform the duties of carrier customer service representative. Hackett also stated that she found the Glick reference letter unusual because it described the relationship between the supervisor and employee as "close as any two friends can be."
 
 
 17
 After the interviews were completed, Martin, Hackett, and Esquivel discussed the candidates. Only Esquivel was of the view that Jordan should be hired. Hackett and Martin voted against offering Jordan a position. In her discussions with Martin and Esquivel, Hackett never stated she was opposed to hiring Jordan because of her religious views.
 
 
 18
 Hackett initially opposed the selection of Barbara Smith. After hearing Esquivel's reasons for supporting Smith, Hackett agreed to recommend her. Smith was an evangelical Christian. The group ultimately recommended five persons, four of whom were unanimously supported for the position of carrier customer service representative.
 
 
 19
 The five names were submitted to Nancy Smith. Smith was responsible for approving or rejecting the applicants submitted by the interview team. After reviewing the five applicants' resumes, Smith authorized their hiring.
 
 
 20
 Hackett and Smith discussed Jordan's application for a carrier customer service representative position after Hackett interviewed Jordan. Hackett told Smith of her frustration regarding her inability to "get good answers from Ellie in the interview process."
 
 
 21
 Jordan characterized her interview with Hackett as follows: "I didn't feel my answers were offensive and they were honest answers and even though I was a little bit ill at ease expressing these things I felt it was an acceptably fine interview." Jordan testified further that in response to a question regarding her "goal in life," she stated that her "purpose in life is to please the Lord and to serve my employer and the people that I work with with (sic) the gifts and talents and the abilities and the education that I have wherever I am or whatever I am doing."[4] When Hackett asked Jordan how she dealt with frustration, Jordan responded that "[she] prayed, and when [she] came to that place where [she] was frustrated or stress filled, [she] prayed and asked the Lord for guidance and wisdom and strength to deal with whatever was causing that frustration, and [then she] went back to the task."
 
 
 22
 Smith, who had previously observed Jordan's performance as a clerk and a secretary in WilTel's Tulsa office, agreed with Hackett's conclusion that Jordan was not qualified for the position of carrier customer service representative. Jordan was never offered the position of carrier customer service representative.
 
 
 23
 The record does not demonstrate that Jordan's religious affiliation was discussed by anyone in evaluating her qualifications. Rather, the record is clear that Hackett, Martin, and Smith believed that Jordan was unqualified for the position of carrier customer service representative.
 
 
 24
 Sometime after the decision not to offer Jordan a position, in response to Esquivel's persistent questioning, Hackett replied: "I don't like Ellie because she is into all that Jesus shit and she doesn't fit in." The district court concluded that this statement was direct evidence of discrimination against Jordan because she is "an evangelical Christian who expresses her beliefs." The court also found that: "The defendant has not only failed to prove that Ms. Jordan was not qualified; the evidence instead shows that she was qualified and that she was better qualified than some other persons who were hired." The court did not identify the persons who were less qualified than Jordan.
 
 
 25
 The district court further concluded that, because the EEOC presented direct evidence of discrimination, WilTel had the burden of proving by a preponderance of the evidence that Jordan would not have been hired as a carrier customer service representative even in the absence of a discriminatory motive.
 
 
 26
 The court entered judgment in favor of WilTel, however, because it determined that WilTel would not have hired Jordan if it had known that the Glick reference letter was fraudulent at the time she was denied employment. We have jurisdiction over these timely appeals from the final judgment of the district court.
 
 II
 
 27
 WILTEL'S CHALLENGE TO THE DISTRICT COURT'S FINDINGS
 
 
 28
 WilTel contends that the district court clearly erred in finding that:
 
 
 29
 1. Jordan was qualified for the position of carrier customer service representative.
 
 
 30
 2. Jordan was not hired because she was an evangelical Christian while persons who were not members of her religion were selected.
 
 
 31
 WilTel also maintains that the district court erred in determining that the EEOC presented direct evidence of discrimination, and in shifting the burden to WilTel to persuade the trier of fact that discrimination was not the basis for rejecting Jordan's application.
 
 
 32
 We review the district court's findings of fact for clear error and the court's conclusions of law de novo. Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 39 F.3d 1482, 1491 (10th Cir.1994) (reviewing evidence in a Title VII wrongful firing case).
 
 III
 DISCUSSION
 
 33
 Title VII of the Civil Rights Act of 1964 makes it an unlawful employment practice for an employer to fail or refuse to hire any individual because of such individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1). "The 'factual inquiry' in a Title VII case is '[whether] the defendant intentionally discriminated against the plaintiff.' " United States Postal Service v. Aikens, 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983) (citation omitted). A plaintiff may prove intentional discrimination "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Id. at 716, 103 S.Ct. at 1482 (quoting Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981)).A
 
 
 34
 The district court concluded that the EEOC and Jordan produced direct evidence that WilTel's rejection of Jordan was motivated by discrimination. In reaching this conclusion, the district court relied on the single offensive remark quoted above that Hackett stated in Esquivel's presence. The district court held that WilTel failed to meet its burden of persuasion that Jordan was not qualified, and that the decision not to hire her would have been made in the absence of a discriminatory motive.
 
 
 35
 "[W]hen a plaintiff in a Title VII case [directly] proves that [discrimination] played a motivating part in an employment decision, the defendant may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision" even in the absence of the discriminatory reason. Price Waterhouse v. Hopkins, 490 U.S. 228, 258, 109 S.Ct. 1775, 1794-95, 104 L.Ed.2d 268 (1989). In Price Waterhouse, the Court found that plaintiff proved discrimination through direct evidence that the firm solicited evaluations which contained comments that "were the product of stereotyping," generally relied very heavily on such evaluations in making decisions, and did not disclaim reliance on the discriminatory comments. Id. at 256, 109 S.Ct. at 1793-94.
 
 
 36
 We have previously examined the difference between direct evidence of discriminatory intent and circumstantial evidence that discrimination may have played a part in an employment decision. Heim v. State of Utah, 8 F.3d 1541, 1546 (10th Cir.1993); Ramsey v. City & County of Denver, 907 F.2d 1004, 1007-09 (10th Cir.1990), cert. denied, 506 U.S. 907, 113 S.Ct. 302, 121 L.Ed.2d 225 (1992). In Ramsey, we concluded that evidence of "an existing policy which itself constitutes discrimination" is direct evidence of discrimination. 907 F.2d at 1008 (citing Trans World Airlines v. Thurston, 469 U.S. 111, 121, 105 S.Ct. 613, 621-22, 83 L.Ed.2d 523 (1984)); see also, EEOC v. Wyoming Retirement System, 771 F.2d 1425, 1430 (10th Cir.1985) (statute creating age-based distinction in terms of employment was direct evidence of discrimination). In contrast, we have held that statements which are merely expressions of personal opinion or bias do not constitute direct evidence of discrimination. Heim, 8 F.3d at 1546-47 (manager's remark that "I hate having fucking women in the office" was not direct evidence of discriminatory intent); Ramsey, 907 F.2d at 1008 (director's "feelings about women being better suited to some jobs than others" was not direct evidence of discriminatory intent); Furr v. AT & T Technologies, Inc., 824 F.2d 1537, 1547, 1549 (10th Cir.1987) (managers' statements that a plaintiff could not be promoted because "he was too damned old," and that other plaintiffs were too old to learn new technologies necessary to promotion and too old to be in supervisory or management positions was not direct evidence of discriminatory intent), reh'g denied, 842 F.2d 253 (1988). Because such statements require the trier of fact to infer that discrimination was a motivating cause of an employment decision, they are at most circumstantial evidence of discriminatory intent. Heim, 8 F.3d at 1547; Ramsey, 907 F.2d at 1008; Furr, 824 F.2d at 1547, 1549.
 
 
 37
 No direct evidence was presented that WilTel had a policy of discriminating against evangelical Christians. The record shows that WilTel facilitated Christian worship by providing space for prayer and bible study groups.
 
 
 38
 It is undisputed that Smith made the final hiring decision for the position of carrier customer service representative after considering the recommendations of the Martin-Hackett-Esquivel interview team, reviewing the applicants' resumes, and evaluating Jordan's performance in a clerical and secretarial position. There is no direct evidence that Smith's decision that Jordan was unqualified was based upon animus against evangelical Christians. An evangelical Christian, unanimously recommended by the interview team, was among the first five applicants Smith approved for the position. Marcie Porter, who was also hired by WilTel as a carrier customer service representative, told Martin that she was an evangelical Christian. She also informed Martin that God sent her to work at WilTel.
 
 
 39
 The district court appears to have concluded that Hackett's opinion of Jordan was direct evidence that Wiltel's decision not to hire Jordan was discriminatory based on its finding that Hackett played a dominant role in the interviewing process. The evidence does not support the court's finding that Hackett played a dominant role. At trial, Martin was asked whether he "would have deferred to Julie Hackett's recommendation on a particular employee that would be in her department?" He testified that he would not defer and that "it was a collective decision." Hackett corroborated Martin's testimony by denying that her "opinion ruled the day." Additionally, Hackett testified that had Martin expressed a preference for Jordan, she probably would have recommended that Jordan should be hired "since [Martin] had a significant vote in the matter." Smith testified that Martin played a prominent role in the hiring decisions in March of 1988 and that he was "part of the interview and selection process."
 
 
 40
 There is no evidence in the record that Hackett's aversion to Jordan's expression of her religious views during the interview was a factor in Smith's determination that Jordan was not qualified for the position of carrier customer service representative. Compare Price Waterhouse v. Hopkins, 490 U.S. at 256, 109 S.Ct. at 1793-94. In Price Waterhouse, the Court found that it was plausible that the decisionmaker "did in fact take into account" the partners' discriminatory comments in reaching its decision not to promote the plaintiff. Id. In contrast, there is no evidence that Smith was aware of Hackett's objection to Jordan's expression of her religious views.
 
 
 41
 We are persuaded that the district court erred as a matter of law in concluding that the EEOC and Jordan presented direct evidence that WilTel's decision not to hire Jordan as a carrier customer service representative was motivated by discrimination. No direct evidence was presented by EEOC and Jordan that Smith's determination that Jordan was not qualified for the position of carrier customer service representative was influenced by a discriminatory intent. Accordingly, the district court erred in holding that WilTel had the burden of persuading the court that Jordan was not qualified, and that rejection of her application was not based on her evangelical Christian views.
 
 B
 
 42
 The EEOC and Jordan also failed to establish discriminatory intent through circumstantial evidence. To establish a violation of Title VII through circumstantial evidence, the EEOC and Jordan were required to prove the following elements: (1) Jordan was a member of a protected class; (2) she applied for and was qualified for an available position; (3) she was rejected despite those specific qualifications; and (4) WilTel hired other persons possessing Jordan's qualifications who were not members of her protected class. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506-08, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993); Patterson v. McLean Credit Union, 491 U.S. 164, 186-87, 109 S.Ct. 2363, 2377-78, 105 L.Ed.2d 132 (1989); Drake v. City of Fort Collins, 927 F.2d 1156, 1160 (10th Cir.1991).
 
 
 43
 It is not clear from the record whether the EEOC and Jordan are claiming that she belongs to a class that consists of Christians, evangelical Christians, or, as the district court characterized it, "evangelical Christian[s] who express[ ] [their] beliefs." Our review of the record does not disclose any evidence that there is a separate protected class consisting of evangelical Christians who express their beliefs. We will assume for purposes of resolving this appeal that the protected group consists of evangelical Christians.
 
 
 44
 WilTel contends that the district court erred in finding that Jordan was qualified for the position of carrier customer service representative. After reviewing the entire record, we are persuaded that the trial court's finding that Jordan was qualified is clearly erroneous. It is undisputed that Jordan did not possess the posted minimum qualifications of two to four years of customer service/telephony experience, and organizational, communications, and interpersonal skills. When viewed in a light most favorable to the EEOC and Jordan, the evidence shows that she received training from Esquivel to perform the duties of a customer service representative, and performed as such when needed during the five month period she was employed as a temporary secretary. No evidence was presented that she had previously worked full time as a customer service representative or in telephony.
 
 
 45
 The EEOC argues that it presented sufficient evidence to prove that she was qualified for the position because other persons who failed to meet the posted job qualifications were hired. In Drake, we concluded that plaintiff established a prima facie violation where, although plaintiff did not meet the stated job qualifications, other applicants also lacked the stated qualifications. 927 F.2d at 1160. We held in Drake that an African American applicant had established a prima facie case of discrimination because two white officers were considered for an opening not offered to him. Id. We reasoned, that the defendant carried its burden of producing evidence that plaintiff and the other applicants were not "like-qualified." Id. We noted that unlike the plaintiff, the applicants who also failed to meet the two year college education requirement had worked as community service officers and had been promised, before the requirement was adopted, that they would be permitted to apply. Id.
 
 
 46
 Similarly, the evidence produced by WilTel demonstrates that the applicants hired by WilTel who did not have two to four years experience were not "like-qualified." The record shows that Jordan's work experience was primarily clerical and that her educational background was in psychology. In contrast, Barbara Smith had worked at WilTel affiliates for three years in accounting and billing, and one year as an accounting/telecommunications clerk. Smith had previously worked for the Tulsa Public School System for five years, first as a programmer trainee and then as an applications programmer. She took courses in accounting and computer science at Tulsa Junior College, was provided technical and computer training at Tulsa Public Schools, and was provided technical and management training by the Williams Companies. Leslie Merriman has a Bachelor of Science degree in business administration with a minor in marketing. At the time of her interview, she had worked at WilTel for seven months as a temporary employee in a technical position. The evidence does not support the district court's finding that Jordan was qualified for the position of carrier customer service representative, or that like-qualified persons were hired who were not evangelical Christians.
 
 
 47
 The EEOC and Jordan failed to meet their burden of presenting persuasive evidence that she was refused employment because she is an evangelical Christian. Hackett's statement to Esquivel did not expressly indicate a bias against evangelical Christians. One inference that can be drawn from her comment is that Hackett believes that it is inappropriate to express religious views in a job interview or in the workplace. This interpretation reflects disapproval of Jordan's social graces or business judgment, not her religious affiliation. Another possible inference is that Hackett is biased against evangelical Christians. This inference is unreasonable in light of the undisputed evidence that Hackett recommended Barbara Smith, a self-professed evangelical Christian, for the position of carrier customer service representative.
 
 
 48
 Our conclusion that the EEOC and Jordan failed to present sufficient evidence that WilTel intentionally discriminated against Jordan in rejecting her application can be summarized as follows: no direct evidence was produced by the EEOC and Jordan that WilTel's motive for rejecting Jordan's application was discriminatory. After the EEOC and Jordan presented circumstantial evidence of Hackett's statement to Esquivel, WilTel met its burden of going forward with evidence by presenting proof that Jordan was not qualified. Drake, 927 F.2d at 1160. Since this is a circumstantial evidence case, the burden of persuasion never shifted to WilTel. See Burdine, 450 U.S. at 253, 101 S.Ct. at 1093 ("[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.") The EEOC failed to demonstrate that Jordan had similar experience and skills to those possessed by the persons who were hired, notwithstanding the fact that some of them also lacked two to four years prior experience as customer service representatives or in telephony. The undisputed evidence shows that evangelical Christians were hired for the position of carrier customer service representative. Thus, the EEOC and Jordan have failed to meet their burden of proving by a preponderance of the evidence that WilTel discriminates against persons of that faith. The district court clearly erred in finding that Jordan was not hired because she is an evangelical Christian.
 
 IV
 EEOC AND JORDAN'S APPEALS ARE MOOT
 
 49
 The EEOC and Jordan seek reversal on the ground that the district court erred in concluding that it was required to enter judgment in favor of WilTel because of the after acquired evidence that Jordan submitted a false reference letter in support of her job application. In view of our determination that the EEOC and Jordan failed to meet their burden of presenting evidence of intentional discrimination, we need not reach the question whether the subsequent discovery of Jordan's falsified reference letter bars relief under Title VII. "We may uphold the district court's decision ... under any ground that the record supports." United States v. Flower, 29 F.3d 530, 536 n. 9 (10th Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 939, 130 L.Ed.2d 884 (1995).
 
 
 50
 AFFIRMED.
 
 
 
 *
 Honorable Arthur L. Alarcon, Senior United States Circuit Judge for the Ninth Circuit, sitting by designation
 
 
 [1]
 Telephony is a telecommunications industry term synonymous with telecommunications
 
 
 [2]
 The reference letter stated in part:
 Over this time we have both been blessed with a very special communication, friendship, and working relationship that has brought us as close as any two friends can be.
 Ellie portrays excellence in all areas as a human being, peer, co-worker, and subordinate; so it is unnecessary for me to go into specific details. It is apparent from this letter that we feel a deep sorrow in her leaving, and the only reason I don't recommend her highly is because I don't want to lose her. Our loss is your gain.
 We wish Ellie much success and good fortune in her new position. She knows that if you aren't going to be good to her, she can come to us. She has captured the hearts of everyone with whom she has come into contact here at the Synagogue and the School, and that tells the whole story.
 
 
 [3]
 At her initial deposition on February 23, 1993, Esquivel testified that "[a]s best I can recall [Miller and Baker] recommended that [Jordan] be hired, that she was capable of handling the job." At her subsequent deposition on February 4, 1994, she testified that Miller and Baker "agreed [Jordan] was qualified but that they did not particularly endorse her being hired."
 
 
 [4]
 Hackett testified that she "certainly did not ask [Jordan] what is your purpose in life."