**Donnie ALLEN Plaintiff,**

v.

**SEACOR MARINE, INC., et al. Defendants.**

**No. CIV.A.G–02–378.**

United States District Court, S.D. Texas, Galveston Division.

Aug. 1, 2003.

654

Francis I. Spagnoletti, Spagnoletti & Assoc., Houston, TX, for Plaintiff.

Ronald L. White, White MacKillop et al., Houston, TX, Christopher David Bertini, Bertini & Asoc. LLP, Galveston, TX, for Defendants.

### ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

KENT, District Judge.

Plaintiff Donnie Allen ("Plaintiff") brings this action against BP Corporation North America, Inc., BP Amoco Corporation, and BP Exploration & Production, Inc. (collectively, "BP" or "BP Defendants") alleging that the BP Defendants are partially responsible for the injuries Plaintiff sustained while working offshore. Now before the Court is BP's Motion for Summary Judgment, and the timely Response thereto. For all of the reasons.

articulated below, BP's Motion is **GRANTED** and the Court hereby **DISMISSES WITH PREJUDICE** all of Plaintiff's claims against the BP Defendants *only.*

## I. FACTUAL BACKGROUND

Plaintiff was employed by Seacor Marine, Inc. ("Seacor") as a deckhand/unlicensed engineer on one of its oil field support vessels, the M/V RON PAUL (the "Vessel"). On November 2, 2001, the day of Plaintiff's injury, the Vessel was alongside one of BP's fixed platforms offshore of Louisiana assisting an offloading of an "x-ray building" from such platform to the Vessel. The cargo was being offloaded from the platform by one of BP's cranes-the crane was attached to the platform but the crane was actually operated by Defendant Lenny Miller, who was employed by Defendant C & D Production Specialists Co., Inc. ("C & D")-the independent contractor that BP hired to operate that particular platform.

The injury occurred while Plaintiff was attempting to release the crane hook and stringer from the offloaded cargo. Plaintiff alleges that the "crane operator allowed the headache ball to fall, causing the ball to crash into the x-ray building and jerking the stringer and hook up and out of Plaintiff's hand causing severe and disabling injuries to his wrist, elbow, arm, and shoulder." As a result, Plaintiff has undergone three surgeries to date, and he anticipates that future surgeries will be necessary.

BP has moved for summary judgment on the grounds that: (1) there were no BP employees on the Vessel or the platform at the time of injury; (2) there is no evidence of a mechanical problem with BP's crane; and (3) the Master Service Contract between BP and C & D ("Contract") identified C & D and its employees as independent contractors. Specifically,

the relevant section of the Contract provides:

> *Independent Contractor.* Contractor shall be an independent contractor with respect to all Work furnished hereunder, and neither Contractor nor anyone used or employed by Contractor shall be deemed for any purpose to be the agent, servant, employee, or representative of Company in the performance of such Work or any part thereof, or in any matter dealt with herein, and *Company shall have no right to direct or control Contractor or its employees and agents, except in the results to be obtained.*

(emphasis added). In response, Plaintiff contends that the Contract's provision identifying C & D as an independent contractor is not dispositive, and that a genuine issue of material fact exists as to BP's exercise of control over C & D's employees on that particular platform.

## II. ANALYSIS

*Summary Judgment Standard*

The BP Defendants move for summary judgment on all claims against them. When considering a motion for summary judgment, the Court accepts the nonmovant's evidence and draws all justifiable inferences in that party's favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Procedurally, the party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553; *see also* Fed.R.Civ.P. 56(c). The burden then shifts to the nonmoving party to establish the existence of a genuine issue for trial. *See Matsushita,* 475 U.S. at 585–87, 106 S.Ct. at 1355–56;

*Wise v. E.I. DuPont De Nemours & Co.,* 58 F.3d 193, 195 (5th Cir.1995). Summary judgment motions should be granted only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). Determining credibility, weighing evidence, and drawing inferences are left to the trier of fact. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). If the evidence is such that a reasonable factfinder could find in favor of the nonmoving party, summary judgment should not be granted. *Id.* at 247–48, 106 S.Ct. at 2510.

*Louisiana Law Applies to Plaintiff's Claims Against BP*

■■■ The Court assumes that BP's fixed platform (where Lenny Miller worked) is on the Outer Continental Shelf offshore of Louisiana.[1] As such, the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331, *et al.* ("OCSLA"), defines what law applies to Plaintiff's claims against BP. OCSLA provides that courts should apply the law of the adjacent state as surrogate federal law to the extent that it is not inconsistent with federal laws and regulations. *See* 43 U.S.C. § 1333(a)(2)(A); *see also Bartholomew v. CNG Producing Co.,* 832 F.2d 326, 328 (5th Cir.1987) (applying Louisiana law *via* OCSLA to determine if a principal is liable for the acts of an independent contractor). Louisiana law should apply as surrogate federal law to Plaintiff's claims against BP if the following test is satisfied: "(1) The controversy must arise on a situs covered by OCSLA (i.e. the subsoil, seabed, or artificial structures permanently or temporarily attached thereto). (2) Federal maritime law must

not apply of its own force. (3) The state law must not be inconsistent with Federal law." *Union Tex. Petroleum Corp. v. PLT Eng'g,* 895 F.2d 1043, 1047 (5th Cir.1990).

The first factor is the only factor in the PLT test that the Court believes presents a close question. In *Hollier v. Union Tex. Petroleum Corp.,* the Fifth Circuit held that the situs factor in the PLT test was satisfied when a plaintiff was killed while transferring from a stationary crew boat to a platform-he slipped between the boat and the platform and drowned-because the plaintiff was in "physical contact with the platform at the time of his injury." 972 F.2d 662, 664–65 (5th Cir.1992). Likewise, in *Hodgen v. Forest Oil Corp.,* the Fifth Circuit held that the OCSLA situs requirement was met when a plaintiff was injured after he crashed into a vessel while swinging on a swing rope from a platform to a vessel because the swing rope was attached to the platform. *See* 87 F.3d 1512, 1524–27 (5th Cir.1996). In the instant case, Plaintiff was injured when the platform's crane's stringer and hook suddenly lurched up while he was trying to unhook the crane from the cargo. Based on the analysis of the aforementioned authority, the Court concludes that the OCSLA situs requirement is satisfied because Plaintiff, although on the Vessel, was in physical contact with the platform-the crane's stringer and hook were attached to the platform just as the swing rope in *Hodgen* was-at the time the injury occurred; therefore, since all three requirements of the PLT test are met, Louisiana law applies to Plaintiff's claims against BP.

---

**1.** The Parties failed to specify whether the platform at issue is affixed to the Outer Continental Shelf's seabed; however, BP did cite 43 U.S.C. § 1333(a)(2)(A) as the basis for applying Louisiana law to the instant matter, which Plaintiff did not refute. If Plaintiff

believes that the Court erred in its determination of what law applies, then Plaintiff may move for reconsideration of the Court's Order on the basis that other substantive law should be applied, and such application will materially alter the Court's analysis in this Order.

*BP Did Not Exercise Sufficient Control Over C & D or Its Employees to Lose BP's Independent Contractor Defense*

 Generally, under Louisiana law, a principal "is not liable for the offenses an independent contractor commits in the course of performing its contractual duties." *Ainsworth v. Shell Offshore, Inc.,* 829 F.2d 548, 549 (5th Cir.1987). However, there are two widely recognized exceptions. First, a principal cannot avoid liability for injuries that result from ultrahazardous activities by delegating such work to an independent contractor. *Id.* at 549–50 (listing pile driving, storage of toxic gas, blasting with explosives, and crop dusting as examples of ultrahazardous activities). The Parties concede that offloading cargo with a crane cannot be considered an ultrahazardous activity. *See Coulter v. Texaco. Inc.,* 117 F.3d 909, 911–12 (5th Cir.1997). Therefore, BP may only be liable if its conduct falls under the second exception, which is when a principal retains or exercises operational control over an independent contractor's negligent acts. *See Ainsworth,* 829 F.2d at 550.

Plaintiff argues that the following acts collectively demonstrate that BP exercised sufficient operational control over C & D's activities to subject BP to liability: (1) BP had a field coordinator (Johnny Morgan) that led daily safety meetings on the primary platform, which Miller attended; (2) Miller would periodically check in with Morgan to discuss the plans for particular tasks; (3) BP requires Miller to perform an inspection of the crane before each lift in accordance with BP's safety forms, and then return those forms to BP; (4) Miller indicated that he had performed the inspection, but no records of such inspection exists; (5) the Contract required C & D to meet BP's minimum safety standards; (6) BP had a safety representative offshore on the primary platform (although not on Miller's platform); and (7) BP had a policy of not allowing more than 5,000 pounds on the fast line, and the x-ray building weighed approximately 6,500 pounds. Further, Plaintiff attaches his expert's report, wherein Edward Ziegler concludes that BP is partially responsible for Plaintiff's injuries because by a "lack of coordination, supervision, planning, and failures in safety programming, the Defendants failed to perform at an acceptable level and to the standard of care in the industry." Last, Plaintiff attaches an internal email among BP employees wherein George Tappin suggests that BP should reemphasize the importance of performing pre-lift inspections and communication between the lift team and the crane operator to prevent future injuries similar to Plaintiff's injuries.

At the outset, the Court observes that Zeigler's report is unpersuasive because he fails to distinguish among Seacor, C & D, Miller, and the BP Defendants in his conclusion. Presumably, by referring to "Defendants," Zeigler concluded that all of the Defendants-including BP-failed to adequately communicate, plan, and supervise the lifting of the x-ray building. Regardless, Zeigler's substantive conclusion cuts against Plaintiff's arguments. Zeigler's report says that the BP Defendants are liable because they failed to plan and supervise the project; however, Plaintiff now argues that the BP Defendants are liable for Miller's actions because they exercised control over the details of his work sufficient to strip them of their independent contractor defense. Plaintiff cannot have it both ways. Likewise, the internal email does not support Plaintiff's contention concerning BP's control over C & D since the email argues for more control, not less.

Second, the Court fails to see how Miller's lack of compliance with two of BP's

safety procedures-alleged failure to turn in his pre-lift inspection report and failure to adhere to the policy of not lifting cargo over 5,000 pounds-evinces BP's control over Miller. Plaintiff is apparently looking to BP's standards and C & D's failure to adhere to them as evidence that BP fell below the applicable standard of care. Again, Plaintiff's proffered evidence cuts against Plaintiff's assertion that BP exercised control over C & D and its employees-BP apparently did not exercise enough control since Miller did not follow BP's guidelines. Thus, in the end, Plaintiff asks this Court to deny BP's Motion based on daily safety meetings at the primary platform, a contract provision requiring C & D and its employees to conform to BP's minimum safety standards, the presence of a BP safety representative at the primary platform, and the fact that Miller occasionally checked signals with the BP representative on particular jobs. After reviewing all of the evidence now before it, and after careful thought and considerable deliberation, the Court concludes, as it must, that Plaintiff has failed to raise a genuine issue of material fact that suggests BP or its employees retained or exercised any right of control substantial enough for BP to lose its independent contractor defense.

■ Initially, the Court must look to the relevant contractual provision between BP and C & D. In Louisiana, the determination of whether C & D should be treated as an independent contractor "depends in great measure upon whether and to what degree the right to control the work has been contractually reserved by the principal." *Hemphill v. State Farm, Ins. Co.*, 472 So.2d 320, 322 (La.App. 3d Cir.1985). Although the Contract provision at issue, *supra*, requires C & D to follow BP's minimum safety guidelines and allows BP to appoint an on-site safety representative, the provision as a whole indicates that C &

D is an independent contractor and that BP has no right to direct the details of C & D's work. However, the Court's analysis does not end there. Certainly a contract's language alone is not dispositive because principals could easily avoid any liability merely by inserting magic words-"the principal retains no control over *Company X's* work because *Company X* is an independent contractor"-in all of their subcontracts despite the fact that the principal retains control over the details of the subcontractors' work *in fact*. In order for Plaintiff to raise a fact question, Plaintiff must generally show that BP:

> retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of right of supervision that the contractor is not entirely free to do the work in his own way.

*See McCormack v. Noble Drilling Corp.*, 608 F.2d 169, 175 n. 9 (5th Cir.1979) (quoting Restatement (Second) of Torts § 414, cmt. c (1965)). The mere presence of BP's safety representative on the primary platform does not raise a fact question without any supporting evidence that suggests the representative *actually* exercised control over C & D's operations-for example, if the safety representative directed Miller to offload the x-ray building a certain way. *See Ainsworth*, 829 F.2d at 550–51 (explaining that the presence of a "company man" aboard a platform alone does not support an imposition of liability upon a

principal for an independent contractor's acts). Moreover, the fact that Miller occasionally checked with the BP representative about his tasks does not indicate that BP exercised operational control over C & D's employees' work. *See Boutwell v. Chevron U.S.A., Inc.,* 864 F.2d 406, 408 (5th Cir.1989). Likewise, the fact that a BP representative held daily safety meetings is not evidence of direct operational control. *See Duplantis v. Shell Offshore, Inc.,* 948 F.2d 187, 193 (5th Cir.1991) ("The fact that a principal takes an active interest [in this case, it was daily safety meetings] in the safety of the employees of its independent contractor does not, in and of itself, constitute direct operational control."). Finally, the contractual provision requiring C & D to follow BP's minimum safety guidelines also fails to rise to the relevant threshold of control. *See Triplette v. Exxon Corp.,* 554 So.2d 1361, 1363 (La.App. 1st Cir.1989) ("Further, even though the contract required that Midwest comply with Exxon safety standards, this requirement does not signify the requisite right of operational control sufficient to vitiate the independent contractor relationship.").

The Court speculates that if BP had a representative or company man *actually* on the platform where Miller worked *at or near the time* that the accident took place, all of the aforementioned evidence taken together with the actual presence of a BP employee would present a very close question as to whether BP exercised operational control. However, since no BP employee was on the Vessel or the platform where Miller worked, it is hard for the Court to fathom that BP was directing Miller's work and asserting operational control over the offloading that ultimately led to Plaintiff's injuries. Thus, for all of the aforementioned reasons, the Court **GRANTS** BP's Motion and **DISMISSES** **WITH PREJUDICE** all of Plaintiff's claims against the BP Defendants only.

## III. CONCLUSION

Before concluding, the Court compliments the Parties' Counsel on their zealous advocacy and thanks them for their hard work and excellent lawyering. For all of the reasons set forth above, the Court hereby **GRANTS** Defendants' Motion for Summary Judgment and **DISMISSES WITH PREJUDICE** all of Plaintiff's claims against the BP Defendants only. Each Party is to bear its own taxable costs and expenses incurred herein to date, regarding any matter treated in this Order.

**IT IS SO ORDERED.**